UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSEPH QUARLES,

　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　Case No:  8:07-cv-200-T-27MAP

CON-WAY FREIGHT, INC. d/b/a
CONWAY SOUTHERN EXPRESS,

　　　　　Defendant.

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 21), to which

Plaintiff has responded in opposition (Dkt. 27). Upon consideration, Defendant's motion is

GRANTED IN PART and DENIED IN PART, as set forth herein.

### *Background*

Plaintiff Joseph Quarles brings this action pursuant to Title VII of the Civil Rights Act, 42

U.S.C. §§ 2000e *et seq.*, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01 *et seq.*

Plaintiff alleges that he suffered racial harassment, disparate treatment, and retaliation.

Plaintiff was hired as a driver in Defendant's Tampa operations terminal in May 2000.

(Shields Dec. ¶ 9). Buddy Shoaf was the Service Center Manager and Plaintiff's direct supervisor.

(Shoaf Dep. at 6). In July 2005, Chris Shields became the Service Center Manager and was

Plaintiff's supervisor until Plaintiff's termination in October 2005. (Shields Dec. ¶ 10).

1.　　　*Alleged racial harassment*

During the course of his employment, Plaintiff alleges that Shoaf made comments of a racial

1

nature on several occasions.  First, Plaintiff alleges that Shoaf referred to him as a "Black Jew,"

when Plaintiff questioned the charge for a rental truck.  (Pl. Dep. at 312, 320-21).  Plaintiff informed

Shoaf that he did not like that term, Shoaf apologized in a sincere manner, and he did not use it

again.  (Pl. Dep. at 312-13).  Second, when Plaintiff told Shoaf that someone had used the "N word,"

Shoaf did not say "N word" back to him, but said: "you mean, somebody said nigger?"  (Pl. Dep. at

310-11).  Plaintiff testified that he was not offended because he knew Shoaf "didn't mean it

personally."  (Pl. Dep. at 311).  Third, Plaintiff avers that Shoaf said, "we're doing the affirmative

action thing.  We have Tinker in the office.  Ha. Ha. Ha."  (Pl. Aff. at 1; Pl. Dep. at 314).  Vashti

Canty, also known as "Tinker," was a black female office employee.  (Pl. Aff. at 1).  According to

Plaintiff, Shoaf also sincerely apologized for this comment.  (Pl. Dep. at 315-16).  Fourth, Plaintiff

avers that Shoaf used the phrase "you people" three or four times.  (Pl. Aff. at 1; Pl. Dep. at 313-14).

Plaintiff also testified to two racially-related incidents involving co-workers.  First, a group

of white drivers asked Plaintiff in conversation "why is it okay if blacks say the word [nigger] to

each other and it's – and if I say it, you get mad?"  (Pl. Dep. at 140-42).  Plaintiff was offended by

this question and reported it to Shoaf.  (Pl. Dep. at 142).  The drivers did not use that word in his

presence again, and Plaintiff did not hear anyone else use the word "nigger" while he was working

for Defendant.  (Pl. Dep. at 141-43).  Second, Plaintiff saw a stuffed animal gorilla or a picture of

a gorilla with the name "Clarence Junior" written on it, placed on a forklift.[1]  (Pl. Aff. at 1; Pl. Dep.

at 97, 100).  Clarence Major was the only black supervisor at the terminal.  (Pl. Aff. at 1).  Plaintiff

reported it to Shoaf.  (Pl. Dep. at 98-99).

---

[1] Plaintiff has also referred to this object as a "caricature of a gorilla" (Pl. Dep., Exh. 19) and "picture . . . of a monkey" (Pl. Dep., Exh. 21 at 2).

Plaintiff also testified that he heard about other racially-related comments and conduct second hand. Dale Harwell, a white employee, told Plaintiff that other white drivers were using the "N word" freely. (Pl. Dep. at 93-94, 102-03). Plaintiff reported this to Shoaf. (Pl. Dep. at 104). Canty told Plaintiff that one of the office employees said "fucking blacks." (Pl. Dep. at 145-46). Plaintiff reported this to Shoaf. (Pl. Dep. at 146). Canty also told Plaintiff that an office employee named Gail said to Canty in a "joking way" "why don't you come change the ink printer. It won't leave a mark on you." (Pl. Dep. at 148). Plaintiff reported this comment to Shoaf. (*Id.*) Plaintiff also testified that John Boos, a white employee, tied a noose and showed it to a black employee, although Plaintiff does not explain how or when he came to learn of this incident. (Pl. Dep. at 92-93). As a result of the incident, Boos was put "out of service" as a disciplinary measure. (Pl. Dep. at 95-96).

In addition to the alleged racial harassment directed toward black employees, Plaintiff avers that he witnessed "extreme harassment" toward Hispanic employees. (Pl. Aff. at 1). The harassment toward Hispanic employees was the subject of a federal court case initiated by the Equal Employment Opportunity Commission against Defendant ("the EEOC action"). (*Id.*) Plaintiff gave an affidavit to the EEOC, dated November 16, 2004, was listed as a witness by the EEOC, and avers that he fully cooperated with the EEOC. (*Id.*, Pl. Dep., Exh. 14).

Plaintiff alleges that Shoaf was aware of his involvement in the EEOC action. (*Id.*) Specifically, Plaintiff avers that sometime before June 2005:

> Mr. Shoaf told me that it would be better for me if I would just "stay out of it'" and "leave it alone." Moreover, Mr. Shoaf told me that I needed to think about it and become a team player. He then repeated that if I wanted to get ahead at Conway, I needed to be a team player. This exchange was clearly and unambiguously a warning to me to stop my assistance to the EEOC. (Pl. Aff. at 1; Pl. Dep. at 395).

Plaintiff also alleges that when he took a day off from work to see the lawyer, Shoaf asked him what

3

he was doing, asked if he was on a street close to the lawyer's office, and stated, "We know that part of town." (Pl. Dep. at 394-96).

2.    *Denial of promotions*

In or around February 2004, Plaintiff applied for a personnel supervisor position. (Shoaf Dep. at 22; Pl. Dep., Exh. 21). Defendant selected another driver, Jon Gefvert, a white male, for the position. (Shoaf Dep. at 22-23). Shoaf testified that he and Steve Hammerschmidt, Shoaf's supervisor, made the decision to hire Gefvert based on his outgoing personality and rapport with the drivers. (Shoaf Dep. at 23). Defendant also asserts that Plaintiff had a temper and that this was a factor in determining which candidate would be selected for the personnel supervisor position. (Dkt. 21 at 13; Shoaf Dep. at 53). Plaintiff avers that Shoaf told Plaintiff that Gefvert was selected because he was a bouncer at a bar. (Pl. Aff. at 2).

In or around March 2005, Plaintiff applied for a freight operations supervisor position. (Pl. Aff. at 1-2). Defendant selected Joe Lanham, a white male, for the position. (Pl. Aff. at 1-2). Plaintiff alleges that Defendant kept the position open until July 2005, when Lanham received his G.E.D., which was a requirement of the job. (Pl. Dep. at 357; Pl. Aff. at 2). Plaintiff avers that he had greater education and work experience than Lanham. (Pl. Aff. at 2). Plaintiff also avers that Shoaf's supervisor, Eddie Corbett, told him after the decision was made that he was better qualified and that other positions would be available if Plaintiff could "hang on just a little longer." (Pl. Dep. at 360).

3.    *Termination*

In October 2005, Shields terminated Plaintiff based, in part, on Plaintiff's failure to properly report damage to his tractor. Defendant required its drivers to complete a both a pre-trip and post-

trip Vehicle Condition Report ("VCR") at the beginning and end of each shift. (Shields Dec. ¶¶ 4-5). Any damage was to be reported to a manager or supervisor. (Pl. Dep. at 170-72; Shields Dec. ¶ 4). In the fall of 2005, Plaintiff and Wayne Harnage were assigned to use the same tractor. (Shields Dec. ¶ 12; Harnage Dec. ¶ 6). Plaintiff drove the tractor during the day shift, while Harnage used the same tractor during the evening shift. (*Id.*).

On Monday, October 3, 2005, Plaintiff noticed that "[t]he bottom of the door and the fairing were not grabbing a lot but enough to hinder the door from opening properly." (Pl. Dep. at 195). Plaintiff complained to two other drivers that the door was sticking. (Pl. Dep. at 224-25). Plaintiff did not report the damage to Shields or Gefvert before leaving the terminal. (Shields Dec. ¶ 16; Pl. Dep. at 199). He did, however, call Jeff Taylor, a freight operations supervisor, after he left the terminal and reported that the fairing was getting worse and that the door was sticking. (Pl. Dep. at 271-73). Plaintiff also noted "Door sticking!" on his post-trip VCR on October 3, 2005. (Pl. Dep. at 251; Shields Dec., Exh. 6).

When Harnage conducted his inspection of the tractor at the beginning of his evening shift, he discovered that "fiberglass and paint were chipping off the back of the driver's side fairing, and the fairing was cracked." (Harnage Dec. ¶ 13).[2] Harnage also saw "chips of paint and fiberglass on the trailer Mr. Quarles used during his route," which "matched perfectly with the damage to the tractor's fairing." (Harnage Dec. ¶ 13). Based on the damage, Harnage believed that the tractor had been "jack-knifed," which occurs "when the vehicle turns sharply while backing up and the turn causes the fairing to come into direct contact with the side of the trailer." (Harnage Dec. ¶ 12).

---

[2] A fairing is "a fiberglass shield on the sides and top of the tractor that assists with aerodynamics." (Harnage Dec. ¶ 7).

5

Harnage reported the damage on his VCR and showed the damage to Shields. (Harnage Dec. ¶ 16; Shields Dec. ¶ 17). Shields examined the tractor and determined, based on the damage, that it appeared the tractor had been involved in jack-knife accident. (Shields Dec. ¶ 18). Plaintiff also testified in his deposition that damage pictured in a photograph of the tractor was consistent with a jack-knife accident. (Pl. Dep. at 256).

Shields met with Plaintiff the following day. (Shields Dec. ¶ 20). He instructed both Plaintiff and Harnage to write statements of the timeline of events and their knowledge of the damage. (Shields Dec. ¶ 21). Plaintiff suggested that the damage had been caused over the weekend or by a previous incident one month earlier. (Shields Dec. ¶¶ 22-23). Shields ascertained that the odometer readings on the post-trip VCR on Friday September 30, 2005 and the pre-trip VCR on Monday, October 3, 2005 were the same, and concluded that the tractor had not been driven over the weekend. (Shields Dec. ¶ 22, Exhs. 5, 6). As to Plaintiff's second explanation, Shields concluded that "there is no way that the aesthetic damage to the passenger side fairing caused the significant structural damage to the driver's side of the fairing a month later." (Shields Dec. ¶ 23).

Because Plaintiff failed to conduct a proper pre-trip VCR and report the damage, Shields informed Plaintiff that he would be given a letter of instruction ("LOI"). (Shields Dec. ¶ 24). Plaintiff testified that Shields asked him to sign an LOI, and Plaintiff refused. (Pl. Dep. at 59-61, 243; Shields Dec. ¶ 25).[3] Shields placed Plaintiff "out of service," or out of work without pay. (Shields Dec. ¶ 25; Pl. Dep. at 61). Shields then instructed two drivers, Bobby Davis and Bob Moore, to inspect every trailer to determine which had been damaged. (Shields Dec. ¶ 27). Both

---

[3] Plaintiff also testified: "And that's when he said, well, if -- if you did it, Joe, then, you know, you sign here you did it, get an LOI. We put this behind us. And that's when I refused. (Pl. Dep. at 243).

identified only one trailer that had damage consistent with a jack-knife incident. (*Id.*)[4] Based on the totality of the circumstances, Shields determined that the accident occurred on Plaintiff's shift on October 3, 2005. Shields averred that "based on the findings of the investigation and Mr. Quarles' refusal to accept responsibility for his actions, I decided to terminate Mr. Quarles' employment." (Shields Dec. ¶ 28).

Shields contends that he did not make any decisions based on Plaintiff's race or membership in any other protected class. (Shields Dec. ¶ 34). As discussed in detail below, Plaintiff contends that Shields' decision was a pretext for unlawful discrimination because two white drivers, Marc Dehainaut and David Linton, engaged in similar offenses but were not terminated.

Plaintiff appealed his termination to Defendant's Employee Termination Review Board ("ETRB"), a panel of three neutral members. (Shields Dec. ¶ 30). Plaintiff did not complain of discrimination at this time. (Kerbo Dec. ¶ 81 Pl. Dep. at 85-86). The board upheld Plaintiff's termination. (Shields Dec. ¶ 31).

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm*

---

[4] Plaintiff submits an unsworn, unsigned exhibit entitled "Affidavit of Bobby Davis," in which Davis avers that he "found a number of trailers, each having such damage and each having the same color of paint rubbed off on to them." (Dkt. 27-5). This affidavit is not admissible. Even if the affidavit is considered, Davis does not aver that he informed Shields that more than one trailer was damaged, nor does this evidence call into question Moore's finding.

*Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### *Discussion*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).[5] Intentional discrimination may be proven

---

[5] Plaintiff brings parallel claims pursuant to the FCRA. Because decisions construing Title VII are applicable to FCRA claims, Plaintiff's claims are analyzed concurrently. *Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1389-90 (11th Cir.1998).

through either direct or circumstantial evidence.   Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (surveying direct evidence cases).

Claims of retaliation and disparate treatment based on circumstantial evidence are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973).   First, a plaintiff must establish a prima facie case of discrimination.  *Id.*; *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004).   If the plaintiff sustains this burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.* The presumption of discrimination is then rebutted, and "the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson,* 376 F.3d at 1087. The plaintiff must meet the defendant's proffered reason head on and rebut it. *Id.* at 1088.   The *McDonnell-Douglas* burden-shifting framework does not apply to claims for hostile work environment. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 510 (11th Cir. 2000).[6]

### A.   *Racial Harassment*

In Counts I and IV, Plaintiff alleges that he was subject to a hostile work environment due to racial harassment.  In order to prevail on a claim for racial harassment, Plaintiff must demonstrate that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on Plaintiff's race; (4) the harassment was sufficiently severe or pervasive to

---

[6] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) Defendant is responsible for such environment under either a theory of vicarious or of direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Defendant does not dispute the first three factors, nor does Defendant dispute that there is a basis for holding it liable. Defendant instead argues that the harassment was not sufficiently severe and pervasive so as to create a discriminatorily abusive working environment. This Court agrees.

The "severe and pervasive" element contains both an objective and a subjective component. Accordingly, the challenged conduct must result in an environment that: (1) a reasonable person would find hostile or abusive; and (2) the victim subjectively perceives to be abusive. *Miller*, 277 F.3d at 1276. In evaluating the objective severity of the harassment, the Court considers, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotations omitted).

As an initial matter, Defendant argues that none of the statements or actions reported to Plaintiff by other employees can be considered in assessing the existence of a hostile work environment. Statements made outside a plaintiff's presence are relevant, however, under certain circumstances, to a plaintiff's subjective perception of a hostile work environment and whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris*, 510 U.S.

at 23.[7]   In order to be relevant to the analysis: (1) Plaintiff must have had knowledge of the statements during the relevant time period; and (2) there must be sufficient evidence as to Plaintiff's basis of knowledge, including "when the statements were made, how knowledge of them was acquired, and when [plaintiff] was informed of them." *See Edwards v. Wallace Commt'y Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995).

In evaluating the frequency of the conduct, the Court notes that Plaintiff alleges that he encountered approximately six instances of racially-related conduct over a period of a "few years," and that approximately four other instances were reported to him by third parties.[8]   Based on the infrequency of the conduct described by Plaintiff, the alleged harassment cannot be considered pervasive. *Compare Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1249 (11th Cir. 1999) (finding five instances of conduct over eleven months too infrequent); *with Johnson*, 234 F.3d at 509 (finding fifteen incidents in four months is frequent). In assessing the frequency of the alleged harassment, there is no "magic number" of racial insults that will preclude summary judgment. *See Miller*, 277 F.3d at 1276. Rather, the question is whether there are "repeated incidents of verbal harassment that continue despite the employee's objections." *Id.*

In evaluating the severity of the conduct, the Court first considers the statements made by

---

[7] *See e.g., Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286 (11th Cir. 2008) (evidence of racial slurs directed to other employees was relevant to racial harassment claim); *Edwards v. Wallace Commt'y Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995); *see also Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991) (trial court abused discretion in excluding testimony of witness relating to racial slurs by other employees referring to plaintiff made outside plaintiff's presence); *cf. Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829-30 (11th Cir. 2007) (statements not made in Plaintiff's presence, not directed at him and made several years earlier are not probative evidence of hostile work environment claim).

[8] In his response in opposition, Plaintiff presents no information pertaining to the dates of the harassment. Plaintiff testified in his deposition that "this was over a few years. Nothing -- it -- it was constant. It never stopped so for me." (Pl. Dep. at 94).

Shoaf: (1) Shoaf called Plaintiff a "Black Jew," when Plaintiff asked the charge for a rental truck;

(2) when Plaintiff told Shoaf that someone had used the "N word," Shoaf said "you mean, somebody

said nigger?"; (3) Shoaf said "we're doing the affirmative action thing.   We have Tinker in the

office. Ha. Ha. Ha."; and (4) Shoaf referred to "you people" three or four times.

Plaintiff testified that he was not offended by Shoaf's use of the word "nigger."   Plaintiff did

not, therefore, subjectively perceive Shoaf's comment to be racially hostile.   Moreover, Shoaf's use

of the word, in context, cannot be considered objectively offensive.   Plaintiff testified that Shoaf

apologized "sincerely" for both the Black Jew comment and the affirmative action comment.   While

both of these comments were boorish and insensitive, they were not severe.   Rather, they are akin

to "off-handed comments in the course of casual conversation."   *Miller*, 277 F.3d at 1277.

By contrast, Shoaf's alleged reference to "you people" on three or four occasions may, under

certain circumstances not present here, indicate a racial animus.   *E.E.O.C. v. Alton Packaging Corp.*,

901 F.2d 920, 923 (11th Cir. 1990) (supervisor's statement to black employee that "you people can't

do a ------- thing right" was direct evidence of discrimination); *Abramson v. William Paterson Coll.*

*of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) (noting that even "the use of 'code words' such as 'all of

you' and 'one of them' could be sufficient evidence from which a jury could find an intent to

discriminate).   Plaintiff testified that when he first heard Shoaf use the phrase he did not know to

which group of people Shoaf was referring.   (Pl. Dep. at 316).   The only specific instance Plaintiff

recalled was in one conversation, when Plaintiff asked Shoaf to walk out on the dock and talk to the

workers, Shoaf responded "you people ask a lot."   (Pl. Dep. at 316).   Plaintiff testified that this was

in reference to race because Plaintiff was talking about "Black folks," and that when he questioned

Shoaf, he apologized.   (Pl. Dep. at 317).   Even accepting this inference, Plaintiff does not allege that

Shoaf made the comments about "you people" in connection with Plaintiff's job performance, or in a threatening or degrading manner.

While frequent degrading comments by a supervisor may constitute actionable racial harassment, Shoaf's comments to Plaintiff fall well short of the required level of severity and frequency to support a hostile work environment claim. *See Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005) (incidents were too sporadic where supervisor, among other incidents, called plaintiff "nigger" three times in one year, repeatedly called him "boy," and told him two or three times that he was going to kick plaintiff's "black ass"). Shoaf's comments must, however, be considered in conjunction with the other alleged incidents involving Plaintiff's co-workers.

Plaintiff alleges that employees used racial epithets on four occasions. First, Plaintiff alleges that a group of white drivers asked him why it was acceptable for blacks to say "nigger," but not for whites. This statement, by Plaintiff's account, was made in conversation and was not uttered in a threatening, demeaning, or pejorative manner. Second, Plaintiff alleges that he heard, second hand, about other instances: Harwell reported that other white drivers were using the "N word;" Canty reported that an unidentified office employee said "fucking blacks;" and Canty reported that a white employee named Gail asked her to change the toner because it would not leave a mark on her.

As to the first two comments, there is insufficient detail for these comments to be considered relevant for the purposes of this analysis. Plaintiff did not hear the comments first hand, Plaintiff does not identify the origin of the comments, and the statements are devoid of any factual detail indicating that they were made in a threatening or intimidating manner. As to the latter comment, Canty allegedly told Plaintiff that it was made in a "joking" rather than threatening manner. The "mere utterance of an . . . epithet which engenders offensive feelings in a employee, does not

13

sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (internal quotations omitted).

More significant in terms of severity are the incidents involving the stuffed animal gorilla (or picture of a gorilla) and the noose. The gorilla with the name "Clarence Junior" written on it, which Plaintiff believed referred to Clarence Major, the only black supervisor, is objectively offensive. The noose that Boos, a white employee, showed to a black employee, is also objectively offensive and physically threatening.[9] Again, however, these incidents were not directed at Plaintiff, and he presents no evidence that he subjectively found either incident offensive or hostile.

While each alleged incident of harassment is not to be examined in a vacuum, *Vance v. S. Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989), *overruled on other grounds, Harris*, 510 U.S. at 22, even when considered together, these incidents lack both the severity and the pervasiveness that have been found to constitute a hostile work environment.[10] Title VII is not a general civility code, *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), and it is violated only "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,'" *Harris*, 510 U.S. at 21. The statements and conduct at issue in this case do not amount to

---

[9] Although Plaintiff fails to explain his source of knowledge regarding the noose, Defendant does not dispute that Boos was disciplined for this incident. Accordingly, the Court considers the reliability of the report regarding the noose incident to be sufficiently established for the purposes of summary judgment.

[10] *See e.g., Webb v. Worldwide Flight Serv., Inc.*, 407 F.3d 1192, 1193 (11th Cir. 2005) (evidence sufficient for jury to find hostile work environment where supervisor referred to plaintiff, on a daily basis for two years, as a "nigger," a "monkey," and being "from the tribe."); *Miller*, 277 F.2d at 1277 (harassment was severe and pervasive where supervisor used racial slurs three to four times a day in an intimidating manner while berating or taunting plaintiff); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068-69 n.3 (11th Cir. 1990) (supervisor used language including: "niggers," "ignorant niggers," and "swahilis." "blacks were meant to be slaves" and were of lower intelligence, and "[t]hose niggers out there will not get anywhere in this company"); *Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 F. App'x 829, 837-38 (11th Cir. 2006) (harassment was severe and pervasive where racial graffiti permeated premises, plaintiffs discovered seven nooses in two years, employees and management directed racial words, jokes, and statements to employees, and employees found it difficult to work productively).

the requisite *severe and pervasive* harassment based on Plaintiff's race.

Accordingly, Defendant's motion for summary judgment is granted on Plaintiff's claims for hostile work environment (Counts I and IV).

### B.    Failure to Promote

In Counts II and V, Plaintiff brings claims for disparate treatment based, in part, on Defendant's failure to promote him to two supervisory positions.  In the response in opposition, Plaintiff has not argued that any direct evidence of discrimination exists as to the failure to promote claims.[11]

### 1.    Prima facie case

To establish a prima facie case of disparate treatment involving a failure to promote, Plaintiff must establish: (1) he is the member of a protected minority; (2) he was qualified for promotion; (3) he was rejected despite his qualifications; and (4) Defendant awarded the promotion to someone outside the protected class.  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005); *see generally Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998).  In the instant motion, Defendant does not dispute that Plaintiff, a black male, was qualified for the two promotions or otherwise disputed that Plaintiff demonstrated a prima facie case based on Defendant's selection of Gefvert and Lanham, both white males, for the challenged supervisory positions.

### 2.    Non-discriminatory reasons

Rather, Defendant argues that it had legitimate, non-discriminatory reasons for selecting

---

[11] The Court notes that Plaintiff avers that when he questioned Shoaf about Lanham's hiring, Shoaf told him that the terminal "was not ready yet." (Pl. Aff. at 2).  Plaintiff avers that this comment referred to being ready for a black supervisor.  (*Id.*)  This comment does not meet the requisite standard for direct evidence, as it does not establish discrimination "without inference or presumption." *Rollins,* 833 F.2d at 1528 n. 6.  In response to the instant motion, Plaintiff has not relied on the version of this statement included in Plaintiff's EEOC Pre-charge Questionnaire, in which he wrote that he was told "we weren't ready for a brother yet." (Pl. Dep., Exh. 21).

Gefvert and Lanham.  Shoaf testified that Gefvert was selected because of his outgoing personality and rapport with the other drivers, while Plaintiff had a temper.  Defendant argues that Lanham was promoted because he "interviewed well."  (Dkt. 21 at 13).  Although Defendant has adequately met its burden of production with respect to the Gefvert promotion, Defendant has not met its burden of production with respect to the Lanham promotion.

While Defendant's burden of production is light, the Eleventh Circuit has expressly held that "there must be evidence that the asserted reasons for discharge *were actually relied on* or the reasons are not sufficient to meet defendant's rebuttal burden." *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (internal quotations omitted and emphasis added); *see also Tex. Dep't of Comm'ty Affairs v. Burdine*, 450 U.S. 248, 255 n.9 (1981) ("the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection," and may not rely on argument of counsel).

In support of Defendant's contention that it hired Lanham instead of Plaintiff because he "interviewed well," Defendant cites to Plaintiff's deposition testimony.  That testimony, in which Plaintiff recounts a conversation with Shoaf, does not support this assertion:

> Q: And then [Shoaf] said, I'm sorry you feel that way, after you---
> A: Yeah.
> Q: -- said that and he never said anything other --
> A: No.
> Q: -- than Lanham did something better than you on the interview?
> A: No, he never said Lanham did anything better than me.
> Q: Well, what did he say about the interview?
> A: He said he interviewed well.
> Q: Well, did he say he'd interviewed better than you or worse --
> A: No.
> Q: -- than you?
> A: No.  He just said well.

16

Plaintiff's testimony reflects only that Lanham interviewed well. It does not reflect that Lanham *was hired because* he interviewed well. More importantly, Plaintiff's deposition testimony is not evidence that Lanham's interview was "actually relied on" by the relevant decisionmaker, whom Defendant has not identified. *See id.* at 1194 (noting that "no witness testified to the particular qualification that was used by defendants"). On this record, the Court finds that Defendant has failed to meet its burden of production as to the Lanham promotion, for the purposes of summary judgment.

**3.      Pretext**

With respect to the Gefvert promotion, for which Defendant has provided non-discriminatory reasons, Plaintiff must demonstrate that each of Defendant's stated reasons are pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 (11th Cir. 2000). Plaintiff may survive summary judgment solely by undermining the credibility of the Defendant's asserted reasons, and need not directly show that Defendant harbored an illegal motive. *Arrington v. Cobb County*, 139 F.3d 865, 875 (11th Cir. 1998). Plaintiff must, however, produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). It is the Court's responsibility "for drawing the lines on what evidence is sufficient to create an issue on pretext." *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002).

Plaintiff argues that Defendant's reasons are pretextual because: (1) Plaintiff was more

qualified than Gefvert; (2) Defendant made the decision shortly after Shoaf learned of Plaintiff's involvement in the EEOC action; (3) Shoaf told Plaintiff that Defendant "was not ready yet" with respect to Lanham's promotion; and (4) Shoaf told Plaintiff that Gefvert was selected because he had been a "bouncer" at a bar.

As to the first contention, when relative qualifications are offered as evidence of pretext, "[courts] do not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001). Accordingly, "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Cooper v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (declining to address proper standard for evaluating relative qualifications). When the qualifications disparity is not the only basis for arguing pretext, however, "the disparity need not be so dramatic to support an inference of pretext." *Vessels*, 408 F.3d at 772.

Plaintiff avers that although he and Gefvert had "similar seniority and driving experience," Plaintiff's educational credentials were greater and he served on Defendant's safety board. Plaintiff produces no evidence as to Gefvert's qualifications and testified that he had "no idea" as to Gefvert's education. (Pl. Dep. at 383). Plaintiff "cannot prove pretext by asserting baldly that she was better qualified than the person who received the position at issue." *Wilson*, 376 F.3d at 1090. Plaintiff has therefore not demonstrated a significant disparity between Plaintiff's and Gefvert's qualifications, sufficient to support a finding of pretext. *Id.*

Plaintiff's second argument, that Shoaf made the decision shortly after learning of Plaintiff's

participation in the EEOC action, is irrelevant for purposes of demonstrating an impermissible *racial*, as opposed to *retaliatory*, motivation.[12]   Similarly, Shoaf's statement that Defendant "was not ready yet," following the Lanham promotion, does not indicate that Shoaf was motivated by an impermissible *racial* motive in making the decision to hire Gefvert.   Finally, Shoaf's purported statement that Gefvert was selected because he was a "bouncer" at a bar does not demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's stated reasons for hiring Gefvert.   Plaintiff may not demonstrate pretext "by simply quarreling with the wisdom of that reason."   *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

As set forth above, Plaintiff has failed to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons" for Gefvert's promotion. *Hurlbert*, 439 F.3d at 1298.   Accordingly, Defendant's motion for summary judgment is granted in part as to the failure to promote claim based on the Gefvert promotion. Defendant's motion for summary judgment is denied in part as to the failure to promote claim based on the Lanham promotion, as Defendant has not met its burden to produce a non-discriminatory reason for Lanham's selection.

## C.   Termination

In addition to the disparate treatment claims for failure to promote, Plaintiff alleges disparate treatment based on his termination.   Plaintiff has not alleged any direct evidence of discrimination with respect to the termination.

---

[12] In any event, as discussed in connection with Plaintiff's retaliation claim, Plaintiff provides no evidence supporting an inference that Shoaf knew of Plaintiff's involvement when the Gefvert promotion decision was made.

### 1.    *Prima facie case*

In order to demonstrate a prima facie case of disparate treatment based on Plaintiff's termination, Plaintiff must show that: (1) he belongs to a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside the classification more favorably; and (4) he was qualified to do the job. *Wilson*, 376 F.3d at 1091 (11th Cir. 2004) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)); *Jones v. Bessemer Carraway Med. Cent.*, 137 F.3d 1306, 1310-11, n.6 (11th Cir. 1998), *opinion modified by* 151 F.3d 1321 (11th Cir.1998). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562.

Defendant contends that Plaintiff cannot show that he was treated differently than similarly situated employees. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Jones*, 137 F.3d at 1311). Thus, "[t]he most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed." Title VII requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999); *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 n.2 (11th Cir. 2006) (affirming that "nearly identical" standard controls in the Eleventh Circuit).

Plaintiff avers that two white male drivers, David Linton and Marc Deinhaut, were not fired

for similar offenses. (Pl. Aff. at 4).[13]   For the purposes of this motion, this Court accepts that the

relevant discipline was determined by Shields, as Defendant has not argued that different supervisors

were involved. *See Silvera*, 244 F.3d at 1261 ("differences in treatment by different supervisors or

decision makers can seldom be the basis for a viable claim of discrimination").

*a. David Linton*

Plaintiff alleges that Linton was in a preventable accident in the summer of 2005, failed to

report this accident, and thereafter denied that he had been in an accident. (Pl. Aff. at 3.) Defendant

argues that Plaintiff has no knowledge of the circumstances of Linton's accident and therefore cannot

establish that he and Linton were treated differently.   Plaintiff has, however, averred that he does

personally know the facts surrounding the accident with Linton in his capacity as a safety board

member. (Pl. Aff. at 3).   Plaintiff avers that Defendant determined that Linton caused the accident

and he was temporarily placed out of service, but not fired.  (*Id.*)

*b.   Marc Dehainaut*

In late August or early September 2005, Plaintiff avers that Dehainaut was in a preventable

accident, causing a gash[14] to the fairing of a tractor, the same tractor Plaintiff and Harnage routinely

drove. (*Id.*; Pl. Dep. at 370-71).   Dehainaut failed to report the accident and denied in involvement

in the accident. (*Id.*; Pl. Dep. at 370-71). Instead, Harnage reported the damage. (Shields Dec. ¶ 13).

Defendant determined that Dehainaut caused the damage and he received a LOI.  (Pl. Aff. at 3;

Dehainaut Aff. at 1).  Dehainaut also avers that he had a prior accident within the last twelve month

---

[13] Plaintiff also avers that "while I do not know the details behind them, I am aware of numerous other times that white drivers were involved in accidents but were not fired." (Pl. Aff. at 3).  These unidentified white drivers are not sufficient comparators, as Plaintiff has failed to provide any details regarding the incidents sufficient to demonstrate that they are "nearly identical."

[14] Shields characterizes it as a "scratch." (Shields Dec. ¶ 13).

period. (Dehainaut Aff. at 1).

Defendant argues that Dehainaut is not a sufficient comparator because the investigation did not allow Defendant to determine who caused the damage. (Shields Dec. ¶ 15). This is in conflict with both Plaintiff's and Dehainaut's affidavits, which aver that Defendant determined Dehainaut was at fault. Defendant's argument is also belied by Defendant's second argument that Dehainaut "accepted responsibility for his actions and acknowledged the same." (Dkt. 21 at17). In making this argument, Defendant implicitly concedes that it determined Dehainaut was at fault.

Based on the foregoing, Plaintiff has demonstrated, at the least, that Dehainaut engaged in conduct "nearly identical," if not more serious given his previous accident, and was disciplined less severely than Plaintiff. Accordingly, Plaintiff sufficiently demonstrates the existence of a similarly situated comparator for the purposes of establishing a prima facie case.

**2.      *Non-discriminatory reason***

Defendant contends that Plaintiff was terminated because of: (1) Plaintiff's violation of the company's policies to conduct proper inspections and report damage to vehicles; and (2) Plaintiff's refusal to accept responsibility for his actions. (Shields Dec.¶¶ 28, 32).[15]

**3.      *Pretext***

When an employer relies on a plaintiff's violation of a work rule as the legitimate, non-discriminatory reason for the adverse employment action, a plaintiff may demonstrate that the "work rule defense" is pretextual if he submits evidence that: (1) he did not violate the particular work rule; or (2) if he did violate the rule, other employees outside the protected class, who engaged in similar

---

[15] Defendant has noted that the ETRB reviewed and affirmed Shields' decision to terminate Plaintiff. Defendant has not argued that the ETRB was the actual decisionmaker, nor has Defendant argued that the ETRB had different or additional non-discriminatory reasons for Plaintiff's termination.

acts, were not similarly treated. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999); *Anderson v. Savage Labs., Inc.*, 675 F.2d 1221, 1224 (11th Cir. 1982). Plaintiff argues that both grounds are present.

First, Plaintiff argues that he did report damage on the VCR consistent with Defendant's policy. Specifically, he avers:

> Because Conway's policy is that you do not keep documenting the same existing damage, I only documented when the fairing appeared to get worse during normal driving or when the driver door started sticking as a result of the fairing being askew. In spite of the fact that duplicates of each VCR are kept by Conway in the normal course of business, these VCRs for the month of September of 2005 have mysteriously come up missing at Conway. (Pl. Aff. at 2).

Shields confirmed that the "only reason a driver would not report damage found on a vehicle is if the damage has already been reported to a supervisor." (Shields Dec. ¶ 6). Shields contends, however, that the damage to the tractor was to the driver's side fairing, not the passenger side fairing, and it was therefore not the same damage.

Plaintiff has not disputed this fact. Indeed, Plaintiff's affidavit reflects that it was the passenger's side door that was "sticking" at the beginning of his shift on October 3, 2005. (Pl. Aff. at 2). Rather, Plaintiff argues that the damage occurred some time before his October 3, 2005 shift. In making this argument, Plaintiff implicitly concedes that he failed to report the purported recent damage and therefore violated the policy to report damage. Moreover, Defendant argues that Shields confirmed that the tractor had not been driven the weekend preceding Plaintiff's shift by comparing the odometer readings. In addition, Shields had two experienced drivers inspect all the trailers, who found only one with paint marks consistent with a jack-knife accident, the trailer used by Plaintiff. Therefore, Plaintiff either failed to report recent damage at the beginning of his shift, or Plaintiff was in an unreported accident during his shift, both of which are violations of Defendant's work rules.

23

"The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue." *Dawson v. Henry County Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007) (citing *Elrod v. Sears Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)).[16] Based on the foregoing, Plaintiff has not produced sufficient evidence to create an issue of fact as to whether he was involved in the underlying accident or failed to report damage to the tractor. *Cf. Damon*, 196 F.3 at 1363 (finding plaintiff denied allegations and "adduced sufficient evidence to create a genuine dispute of material fact as to his job performance.")

Nonetheless, Plaintiff does present undisputed evidence that two white employees, Linton and Dehainaut, were not terminated after their unreported accidents. The evidence indicates that both disciplinary decisions were made by Shields, and were reasonably close in time to Plaintiff's termination. In addition, there is no evidence that Defendant "had ever before treated a solitary violation of this rule as grounds for termination." *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564 (11th Cir. 1987).[17]

Were this Defendant's only stated reason for Plaintiff's termination, Plaintiff would arguably

---

[16] Whether the Defendant's incorrect, but allegedly "honest belief," that Plaintiff violated the work rule is a proper consideration at the summary judgment stage is unclear. This rationale has been invoked at the summary judgment stage in unpublished Eleventh Circuit decisions. *See e.g., Dawson*, 238 F. App'x at 549; *Moore v. ITT Tech. Institute*, 226 F. App'x 869, 871 (11th Cir. 2007). In *Elrod v. Sears Roebuck and Company*, however, the Eleventh Circuit applied this principle in evaluating the sufficiency of evidence *at trial*, which is consistent with *Damon's* dicta that evidence that a plaintiff did not violate a work rule is used to evaluate whether the question of racial motivation is sufficient to reach a jury. *See Damon*, 196 F.3d at 1363 n.3; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 154-55 (2000) (Ginsburg, J., concurring) (noting that evidence that defendant gave a false explanation for its actions "gives rise to a rational inference that the defendant could be masking its actual, illegal motivation" that remains for a jury unless conclusively rebutted at trial). In any event, as noted, Plaintiff has not introduced any evidence sufficient to create a disputed fact as to whether he was actually involved in an accident, and thus, does not meet the threshold for demonstrating pretext.

[17] Dehainaut averred that Defendant had a clear policy which allowed a driver to have three preventable accidents within a twelve month period before Defendant discharged the driver for cause. (Dehainaut Aff. at 2). This contention does not, however, address Defendant's policy of *reporting* accidents.

demonstrate pretext. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993) ("In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case").   However, Plaintiff must rebut each of Defendant's reasons to survive a motion for summary judgment. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007). Defendant also contends that Plaintiff was terminated because he "refused to accept responsibility."  Plaintiff's failure to accept responsibility for the accident is a reason "that might motivate a reasonable employer." *Chapman*, 229 F.3d at 1030.  Plaintiff therefore "must meet that reason head on and rebut it, and . . . cannot succeed by simply quarreling with the wisdom of that reason." *Id.*

Far from rebutting this contention, Plaintiff does not dispute that he "failed to accept responsibility" insofar that he refused to sign a LOI.  It is also undisputed that Dehainaut, unlike Plaintiff, did sign a LOI.  "[A]n employer is entitled to expect and to require truthfulness and accuracy from its employees." *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (holding that plaintiff employee "could properly be discharged based on Defendant's good faith belief that she lied in an internal investigation.").  Moreover, as oft-stated, "[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *See Chapman,* 229 F.3d at 1030; *see e.g., Silvera*, 244 F.3d at 1262 (finding Defendant's reliance on media attention and perceived public pressure to be a sufficiently race neutral reason for plaintiff's firing).  This Court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Chapman*, 229 F.3d at 1030.

Plaintiff has failed to demonstrate that Defendant's stated reasons for his termination -- his

policy infractions, when combined with his failure to accept responsibility by signing a LOI -- were pretext for an unlawful racial animus. Accordingly, Defendant's motion for summary judgment on Plaintiff's disparate treatment termination claims is granted.

### D. Retaliation

In Counts III and VI, Plaintiff alleges that he engaged in protected activity by reporting the alleged incidents of racial harassment to Shoaf and by participating as a witness in the EEOC action (Compl. ¶ 44), and in retaliation, Defendant failed to promote him and ultimately terminated his employment.

### 1. Direct evidence

Plaintiff claims that direct evidence of retaliation exists with respect to the promotions, based on Shoaf's alleged statements to Plaintiff:

> Mr. Shoaf told me that it would be better for me if I would just "stay out of it'" and "leave it alone." Moreover, Mr. Shoaf told me that I needed to think about it and become a team player. He then repeated that if I wanted to get ahead at Conway, I needed to be a team player. This exchange was clearly and unambiguously a warning to me to stop my assistance to the EEOC. (Pl. Aff. at 1; Pl. Dep. at 395).

Shoaf's comments, while arguably probative of a retaliatory animus with respect to the challenged promotion decisions, do not constitute direct evidence of retaliation.

Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins*, 833 F.2d at 1528 n. 6. "To be direct evidence, the remark must indicate that the employment decision *in question* was motivated by [retaliation]." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir.2002) (emphasis added). Therefore, "remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998); *See Burrell v. Bd. of Trs. of Ga.*

26

*Military Coll.,* 125 F.3d 1390, 1393 (11th Cir.1997) (noting that comments by decisionmaker did "not specifically address nor were they made in the context of Plaintiff retaining her job").

Shoaf's alleged comments do not directly refer to Plaintiff's alleged protected activity, his informal complaints or the EEOC action. Moreover, Plaintiff provides no evidence supporting an inference that Shoaf's statements were made in connection with the challenged decisions or within reasonably close temporal proximity to the decisions. Indeed, there is no evidence as to when Shoaf made these comments, other than Plaintiff's testimony that it occurred sometime "before June 2005," when Shoaf was fired. (Pl. Dep. at 395). On this record, the Court cannot find that Shoaf's statements demonstrate a retaliatory motive "without inference or presumption." *See Scott,* 295 F.3d at 1228 (comment "[w]e'll burn his black ass" was not direct evidence because it was made approximately two and one-half years before the termination and was not directly related to the subject of plaintiff's termination).

### 2.   *Prima facie case*

In order to state a prima facie case of retaliation, Plaintiff must present evidence that: (1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n. 52 (11th Cir. 2008). In order to constitute an adverse employment action, for the purposes of a retaliation claim, "[t]he challenged action must be materially adverse from the standpoint of a reasonable employee." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, (2006)).[18]

_____

[18] Although Defendant does not contest "the adverse employment action" element, Plaintiff contends that the Supreme Court "no longer requires a showing of adverse employment action." (Dkt. 27 at 16). This is an incorrect interpretation of *Burlington Northern.* The Supreme Court merely defined what constitutes an adverse employment action for the purposes of a retaliation claim: an action that is "materially adverse from the standpoint of

Defendant does not dispute that Plaintiff engaged in statutorily protected activity. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 n.2 (11th Cir. 2002) (informal complaints to superiors regarding discrimination constitutes protected activity); *cf. Little v. United Techs.*, 103 F.3d 956, 959-60 (11th Cir. 1997) (plaintiff's opposition to co-worker's remark was not protected activity). Nor does Defendant dispute that Plaintiff's termination and the promotion decisions constitute adverse employment actions. Rather, Defendant contends that Plaintiff has failed to demonstrate evidence of causation. Specifically, Defendant contends that there is no evidence: (1) that Gefvert and Shoaf were aware of Plaintiff's complaints or participation in the EEOC action when they made the promotion decisions;[19] or (2) that Shields was aware of Plaintiff's complaints or participation in the EEOC action at the time of Plaintiff's termination.

In order to establish causation, Plaintiff must provide evidence that the decisionmaker was aware of the protected conduct and that there was close temporal proximity between this knowledge and the adverse employment action, or other evidence "'that the protected activity and the adverse action were not wholly unrelated.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999); *Gupta*, 212 F.3d at 590. In the case of a corporate defendant, as here, Plaintiff must demonstrate that "the corporate agent who took the adverse action was aware of the plaintiff's protected expression." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). To survive summary judgment, Plaintiff must "set forth significant probative evidence regarding the identity, authority and knowledge of [Defendant's] agent" who affected the allegedly retaliatory

a reasonable employee." As Defendant's motion for summary judgment is denied as to the retaliatory failure to promote claims, the Court does not reach the question of whether Shoaf's comments with respect to Plaintiff being a "team player" are, by themselves, "materially adverse from the standpoint of a reasonable employee."

[19] The Court does not evaluate Gefvert's knowledge, as neither party has introduced evidence that Gefvert was a decisionmaker with respect to the challenged promotion decisions.

actions. *Id.* at 1198.

Plaintiff, far from producing significant probative evidence, does not address Defendant's arguments in his response in opposition to Defendant's motion for summary judgment. (*See* Dkt. 27 at 16). It is undisputed that Shields was the decisionmaker in Plaintiff's termination. Plaintiff has not introduced any evidence that Shields was aware of Plaintiff's informal complaints to Shoaf or that he was aware of Plaintiff's participation in the EEOC action when he made the decision to terminate Plaintiff. "A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Plaintiff has failed to prove a prima facie case based on retaliatory termination.

With respect to the failures to promote, it is undisputed that Shoaf was the decisionmaker in the Gefvert promotion. By contrast, neither party identifies the decisionmaker in the Lanham promotion. Plaintiff avers that this position was filled around July 2005 (Pl. Aff. at 2), which is when Shields was Plaintiff's supervisor. However, Plaintiff alleged in his FCHR Charge and EEOC Pre-Charge Questionnaire that this decision was made around June 2005 (Pl. Dep., Exhs. 19, 21), when Shoaf was still Plaintiff's supervisor. Plaintiff also indicates that he spoke with Shoaf about the decision, rather than Shields. Accordingly, the Court accepts the inference for the purposes of the instant motion, that Shoaf made both of the challenged promotion decisions.

It is undisputed that Shoaf was, at all times, aware of Plaintiff's informal complaints because Plaintiff made those complaints to Shoaf. (Dkt. 21 at 24). Thus, it is undisputed that Shoaf was aware of Plaintiff's alleged protected activity, insofar as it comprised his informal complaints. The evidence also indicates that Shoaf was arguably aware of Plaintiff's participation in the EEOC action before June 2005, when the decision regarding the Lanham position was made, based on Shoaf's

statements discussed above, to "stay out of it'" and "leave it alone," as well as his questions to Plaintiff regarding his whereabouts the day he took off work to meet with the attorney. This is sufficient circumstantial evidence of Shoaf's awareness of Plaintiff's participation in the EEOC action at the time of the Lanham promotion. *Brungart*, 231 F.3d at 799 (noting that "defendant's awareness can be established by circumstantial evidence").

In the motion for summary judgment, Defendant has not otherwise challenged Plaintiff's ability to demonstrate a causal connection based on temporal proximity, Defendant has not disputed that Plaintiff engaged in protected activity based on the informal complaints and participation in the EEOC action, and Defendant has not articulated a legitimate non-discriminatory reason with respect to the retaliation claims.[20] (*See* Dkt. 21 at 22-24).

Accordingly, Defendant's motion for summary judgment is denied in part on Plaintiff's claims for retaliation based on Defendant's failure to promote. Defendant's motion for summary judgment is, however, granted in part on Plaintiff's claims for retaliation based on Plaintiff's termination.

### Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 21) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1)      With respect to Counts I and IV (Title VII and FCRA hostile work environment), the motion is **GRANTED**.

2)      With respect to Counts II and V (Title VII and FCRA disparate treatment), the

---

[20] To the extent Defendant relies on the same non-discriminatory reasons asserted with respect to the disparate treatment/failure to promote claims, Defendant has not argued this and the Court therefore does not reach the second prong of the *McDonnell-Douglas* inquiry.

30

motion is **GRANTED IN PART** as to the disparate treatment/termination claim, **GRANTED IN PART** as to the disparate treatment/Gefvert promotion claim, and **DENIED IN PART** as to disparate treatment/Lanham promotion claim.

      3)     With respect to Counts III and VI (Title VII and FCRA retaliation), the motion is **GRANTED IN PART** as to the retaliatory termination claim and **DENIED IN PART** as to retaliatory failure to promote claims as to both the Lanham and Gefvert promotions.

     **DONE AND ORDERED** in chambers this __8th__ day of May, 2008.

                                    **JAMES D. WHITTEMORE**
                                      United States District Judge

Copies to:
Counsel of Record